693 S.E.2d 346

**Jerry GOLDIZEN and Bill Goldizen, Co–Administrators of the Estate of Elva Lee Goldizen, Plaintiffs Below, Appellants,**

v.

**GRANT COUNTY NURSING HOME, Defendant Below, Appellee.**

No. 34888.

Supreme Court of Appeals of West Virginia.

Submitted March 30, 2010.

Decided April 21, 2010.

all other parties in pending cases.' *Crowe v. Bolduc*, 365 F.3d 86, 93 (1st Cir.2004).").

J. David Cecil, Esq., Barth & Thompson, Charleston, WV, for Appellants.

Rita Massie Biser, Esq., Moore & Biser PLLC, South Charleston, WV, for Appellee.

PER CURIAM:

Jerry Goldizen and Bill Goldizen, co-administrators of the Estate of Elva Lee Goldizen ("Plaintiffs"), appeal an order of the Circuit Court of Grant County, denying their "Motion to Alter and Amend Judgment Order." In that order, the circuit court affirmed its prior order granting summary judgment to the Appellee, Grant County Nursing Home ("Defendant" or "nursing home"). Having fully considered the record, arguments and briefs of the parties, we reverse the circuit court.

## I. Factual Background

On October 31, 2003, Elva Goldizen, a resident of the defendant nursing home, suffered a medical emergency while being fed lunch by staff of the Defendant. An ambulance was called, and Ms. Goldizen was transported to a hospital where her condition continued to deteriorate and she subsequently died. Hospital and emergency medical service (EMS) records, as well as records of the Defendant, indicate that Ms. Goldizen aspirated solid fish particles, causing an airway blockage.

The records at issue include those prepared by the Defendant, which relate that Ms. Goldizen, following her medical event in the Defendant's dining area, was returned to her room where nursing staff noted fish particles in her mouth. After swabbing out the particles, the Heimlich maneuver was performed which produced more food particles. The records also include those prepared by the ambulance service called to the nursing home and the hospital where Ms. Goldizen was taken. The hospital records note Ms. Goldizen's condition upon arrival as follows: "EMS reports possible aspiration of fish. Unable to clear airway with Heimlich maneuver." At the hospital, suction was used to try and clear Ms. Goldizen's airway, producing even more fish particles.

Dr. Dewey Bensenhaver, Medical Director for the Defendant nursing home, completed the cause of death section of Ms. Goldizen's death certificate. Dr. Bensenhaver certified the immediate cause of death as being due to "Acute Aspiration." Dr. Bensenhaver further listed "Parlunson's severe" in the section of the death certificate reserved for "other significant conditions contributing to

death but not resulting in the underlying cause" of death.

The Plaintiffs, alleging that the Defendant nursing home had knowledge of Ms. Goldizen's difficulty eating solid foods, and that she had been prescribed a diet of ground meats and other soft, non-solid foods, filed a wrongful death action against the nursing home.

The nursing home defended the wrongful death claim, noting that Ms. Goldizen had the following medical conditions: "Alzheimer's disease; Parkinson's disease; Type II diabetes; paralysis agitans; other disorders of neurohypophysis; hypertension; congestive heart failure, hyposmololity and/or hyponatremia; unspecified arthropathy; hypopotassemia; edema; and depressive disorder. She required 16 various medications." The Defendant's records further noted that at the onset of her medical emergency Ms. Goldizen "stiffened up and put her hands to her chest" and, when asked by nursing staff if she were having chest pains, "Ms. Goldizen verbally responded 'yes' she was having chest pain."

Following the filing of the wrongful death action, the circuit court entered a scheduling order listing the dates by which all discovery and disclosures were to be made. In the Plaintiffs' response to the Defendant's discovery requests, the Plaintiffs listed Dr. Dewey Bensenhaver as their expert witness on causation. The Plaintiffs also listed as witnesses several people who attended to Ms. Goldizen following her medical emergency, including nursing home staff and hospital staff, the latter including the physician who attended to Ms. Goldizen at the hospital emergency room, Dr. Robert Gaudet.

Dr. Bensenhaver was deposed, during which he opined that the cause of death he certified on Ms. Goldizen's death certificate was in error. Dr. Bensenhaver testified that after reviewing all of the medical records associated with Ms. Goldizen's medical emergency, he no longer believed that the immediate cause of death was acute aspiration because emergency room records noted that Ms. Goldizen had "agonal respirations." Dr. Bensenhaver explained that the reported incidence of Ms. Goldizen experiencing any respirations was contrary to a conclusion that she had an obstructed airway—she would not have been able to breathe at all if her airway was obstructed.

The record shows that notwithstanding Dr. Bensenhaver's changed position, the Plaintiffs were dilatory in obtaining the deposition of Dr. Gaudet as an additional witness on causation. As the trial date neared, the Plaintiffs filed motions to vacate the scheduling order and sought a continuance of the trial to allow the deposition of Dr. Gaudet. Listed as one of the grounds in support of the motion was the Plaintiffs' assertion that they had been unable to locate Dr. Gaudet, and therefore could not depose him. The Plaintiffs' motions were opposed by the Defendant. The Defendant, in turn, moved to exclude Dr. Gaudet's testimony and also moved for summary judgment on the basis that the Plaintiffs did not have an expert witness on causation.

In addressing the motion to continue and to exclude Dr. Gaudet's testimony or deposition, the circuit court held that the Plaintiffs had not "made good efforts to find [Dr. Gaudet]" and noted that the case was "way past the discovery deadlines" and, therefore, the court was "not going to allow Dr. Gaudet to testify in this matter or his deposition to be taken." After excluding Dr. Gaudet's testimony, the circuit court granted the Defendant's motion for summary judgment. In granting summary judgment, the circuit court concluded that the Plaintiffs could not prove causation. The Plaintiffs' "Motion to Alter or Amend the Judgment" was subsequently denied, and this Appeal followed.

## II. Standard of Review

■ "A circuit court's entry of summary judgment is reviewed *de novo*." Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

## III. Discussion

■ We have consistently held that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Company v. Federal Insurance Company of New York,*

148 W.Va. 160, 133 S.E.2d 770 (1963). Having reviewed the record, we find that a genuine issue of fact exists on the issue of causation and that the circuit court therefore erred in granting summary judgment.

Pursuant to *W.Va.Code*, 16–5–19(a) [2006], a death certificate is required to be completed and filed with the State Registrar of Vital Statistics for all persons who die within the State.[1] Subsection (c) of *W.Va.Code*, 16–5–19 requires a medical certification as to the cause of death. Subsection (c)(2) requires that the "person completing the cause of death shall attest to its accuracy...."[2] In the case before us, this certification was completed by Dr. Bensenhaver[3] and the immediate cause of Ms. Goldizen's death is certified—attested to—by Dr. Bensenhaver as having been caused by "acute aspiration." While it may be that Dr. Bensenhaver has changed his opinion as to the cause of death, the fact remains that under our law, a "certified copy of a vital record issued in accordance with this section ... shall be *prima facie* evidence of the facts stated in the record." *W.Va.Code*, 16–5–28(d) [2006].[4]

This is not to say, however, that *prima facie* status exists for all purposes and in all instances. In Syllabus Point 1, *Dorsey v. The Prudential Insurance Company of America*, 124 W.Va. 100, 19 S.E.2d 152 (1942), where we examined the predecessor statute to *W.Va.Code*, 16–5–28(d) [2006], we held that "[u]nder the provisions of Chapter 32, Acts 1939, a properly certified copy of a death certificate is *prima facie* evidence only of such facts as are stated therein without contradiction or equivocation." In *Dorsey*, the decedent's death certificate was not a sufficient statement to be accorded *prima facie* status as evidence where the certification provided that death was caused by a ruptured duodenal ulcer "Said to have ruptured while lifting" and included on the certification the uncertain query "Lifting immediate cause?" *Dorsey*, 124 W.Va. at 101–102, 19 S.E.2d at 154.[5]

---

1. *W.Va.Code*, 16–5–19(a) [2006] provides as follows:

   A certificate of death for each death which occurs in this state shall be filed with the section of vital statistics, or as otherwise directed by the State Registrar, within five days after death, and prior to final disposition, and shall be registered if it has been completed and filed in accordance with this section.

2. *W.Va.Code*, 16–5–19(c) [2006] provides as follows:

   The medical certification shall be completed and signed within twenty-four hours after receipt of the certificate of death by the physician in charge of the patient's care for the illness or condition which resulted in death except when inquiry is required pursuant to chapter sixty-one, article twelve [61–12–1 et seq.] or other applicable provisions of this code.
   (1) In the absence of the physician or with his or her approval, the certificate may be completed by his or her associate physician, any physician who has been placed in a position of responsibility for any medical coverage of the decedent, the chief medical officer of the institution in which death occurred, or the physician who performed an autopsy upon the decedent, provided inquiry is not required pursuant to chapter sixty-one, article twelve [61–12–1 et seq.] of this code.
   (2) The person completing the cause of death shall attest to its accuracy either by signature or by an approved electronic process.

3. Dr. Gaudet also signed the death certificate in the section marked for the "Pronouncing Physician Only."

4. *W.Va.Code*, 16–5–28(d) [2006] provides as follows:

   A certified copy of a vital record issued in accordance with this section shall be considered for all purposes the same as the original, and shall be prima facie evidence of the facts stated in the record: Provided, That the evidentiary value of a certificate or record filed more than one year after the event, or a record which has been amended, or a certificate of foreign birth, shall be determined by the judicial or administrative body or official before whom the certificate is offered as evidence.

5. In *Bailey v. C.V. Hunter, Inc.*, 207 Va. 123, 125, 148 S.E.2d 826, 828 (1966) (citations omitted), the Virginia Supreme Court explained a similar provision as follows:

   Unquestionably the statute makes a certified copy of a death certificate issued by the State registrar of the Bureau of Vital Statistics *prima facie* evidence of the facts stated therein. However, the language of the statute means that only *facts* contained in the certificate are accorded the dignity of *prima facie* evidence. The statute does not provide that a mere opinion or conclusion, expressed by a person signing the certificate who has no personal knowledge of the facts, shall be *prima facie* proof of the *facts* to be determined.

■ There is no equivocation as to the facts stated in Ms. Goldizen's death certificate and it is entitled to be accorded the probative value of *prima facie* evidence. What Dr. Bensenhaver attempts to do through his deposition testimony is to constructively amend Ms. Goldizen's death certificate which—if permitted—would undermine the integrity and accuracy of our vital statistics records.[6] The Legislature recognized the importance of properly amending or correcting a vital statistics record:

> In order to protect the integrity and accuracy of vital records, a certificate or report registered under this article *may be amended only* in accordance with the provisions of this article or legislative rule.

*W.Va.Code,* 16–5–25(a) [2006]. (Emphasis added).

There is no indication in the record before us that Ms. Goldizen's death certificate has been amended as required by *W.Va.Code,* 16–5–25(a) [2006]. Accordingly, the Plaintiffs have *prima facie* evidence that Ms. Goldizen died as a result of "acute aspiration." Records of the Defendant corroborate this certified cause of death, with nursing home staff finding fish particles in Ms. Goldizen's mouth, and finding even more fish particles after performing the Heimlich Maneuver. Hospital records also corroborate that Ms. Goldizen aspirated fish. These latter records show that suction was used in the effort to clear Ms. Goldizen's airway, which produced even more fish particles. One of the hospital nurses who attended to Ms. Goldizen was deposed and in that deposition described Ms. Goldizen's condition, and the treatment provided, as follows:

Q: You have down for respiratory, you have, "Partially obstructed." You made that assessment?

A: Me.

"Agonal respiration noted, suction attempted per RT to obtain food particles."

Q: What does that mean?

A: That they were trying to clear her airway to see if that would, help breathing, and when they did so, they sucked up some food.

A: "Suction continues per R.T. with fish particles obtained."

Q: And with fish particles obtained, did you observe the fish particles?

A: Yes.

Q: Did you make any observation of how much material was extracted from her throat?

A: We didn't measure it, if that's what you're asking. It seemed like a lot because it was pretty much a continuous process.

In granting summary judgment, the circuit court failed to consider all of the evidence, and to consider that under our law a certified cause of death listed on a death certificate is accorded *prima facie* weight as to the facts stated therein. It is clear to us that a genuine issue of material fact exists as to causation. While it is the case that Dr. Bensenhaver has given inconsistent statements on causation, such inconsistencies go to the weight to be afforded his testimony. It is for a jury to decide what weight to give that testimony.

■ The final issue we address is the circuit court's exclusion of Dr. Gaudet from being deposed or giving any testimony at trial. Having reviewed the record, while it does appear that the Plaintiffs were dilatory in their efforts to locate Dr. Gaudet and secure his deposition, we do not find the Plaintiffs' conduct to have been so egregious or prejudicial to the Defendant that the exclusion of Dr. Gaudet's testimony, as a sanction, was warranted. The present issue is not dissimilar to the issue we addressed in *Anderson v. Kunduru,* 215 W.Va. 484, 600 S.E.2d 196 (2004) (per curiam).

In *Anderson,* we reversed the circuit court finding that "the circuit court essentially imposed a sanction upon a party … for the admittedly sole misconduct of the party's attorney." *Id.,* at 488, 600 S.E.2d at 200. In

---

**6.** The issue of whether Dr. Bensenhaver should be permitted to testify in a manner that would constructively amend Ms. Goldizen's death certificate is not before us and we, therefore, will not address that issue except to say that it is an issue that should be addressed upon remand.

the present case, the conduct leading to the circuit court's sanction was that the Plaintiffs' trial counsel [7] had been dilatory in locating a missing witness even though it had been apparent for some time that the Plaintiffs' causation expert would be giving testimony inconsistent with the expert's former attested certification of Ms. Goldizen's cause of death.

In Syllabus Point 2 of *Bartles v. Hinkle*, 196 W.Va. 381, 472 S.E.2d 827 (1996), we set forth the following standard for formulating sanctions:

> In formulating the appropriate sanction, a court shall be guided by equitable principles. Initially, the court must identify the alleged wrongful conduct and determine if it warrants a sanction. The court must explain its reasons clearly on the record if it decides a sanction is appropriate. To determine what will constitute an appropriate sanction, the court may consider the seriousness of the conduct, the impact the conduct had in the case and in the administration of justice, any mitigating circumstances, and whether the conduct was an isolated occurrence or was a pattern of wrongdoing throughout the case.

 While we accord the circuit court considerable deference, and rightfully so, no sanctions were warranted in the case below beyond that of verbally reprimanding Plaintiffs' trial counsel for being dilatory. Trial courts should be extremely guarded against imposing sanctions that tend to eviscerate a party's case on a critical issue. Upon remand, the circuit court shall enter a new scheduling order which shall include the Plaintiffs' right to take the deposition of Dr. Gaudet, as well as allow the parties to identify and depose expert witnesses.

## IV. Conclusion

For the reasons set forth herein, the judgment of the circuit court is reversed and this matter remanded for further proceedings.

Reversed and Remanded.

---

7. We note that counsel of record for the Appellants in this appeal was not trial counsel below.